*In re* MARRIAGE OF BETTY HELLWIG, Petitioner-Appellant and Cross-Appellee, and WERNER HELLWIG, Respondent-Appellee and Cross Appellant.

First District (3rd Division)    Nos. 80-182, 80-755 cons.

Opinion filed September 16, 1981.

Thomas J. Karacid, Kenneth A. Helmin, T. Gregory Mieczynski, and Gregory P. Guth, all of Chicago (Sidney Z. Karasik, of counsel), for appellant.

Bentley, DuCanto & Doss, Ltd., of Chicago (Owen L. Doss and Paul J. Bargiel, of counsel), for appellee.

Mr. JUSTICE McNAMARA delivered the opinion of the court:

Petitioner, Betty Hellwig, and respondent, Werner Hellwig, were married in 1942. Dissolution proceedings were instituted in 1977 and, on September 12, 1979, the trial court entered a judgment dissolving the parties' marriage and disposing of contested matters of property, maintenance and attorney's fees. The division of marital property was later modified by the court *sua sponte*. The court also appointed a sequestrator to collect assets, funds and property belonging to respondent. Petitioner appeals from certain portions of the property disposition, the award of rehabilitative maintenance and the denial of attorney's fees. Respondent cross-appeals from other aspects of the property distribution, the maintenance award and the appointment of a sequestrator. In a separate action, respondent appeals from an order allowing petitioner prospective attorney's fees for defense of the cross-appeal.

At the time of trial, petitioner was 55 years old and respondent was 60. The parties had two adult children. During most of the marriage, petitioner was a homemaker. She had no special skill, training or education, and is not currently employed. She recently underwent several surgeries. Respondent was a tool and die maker and a proprietor of such a

business. In 1974 he entered semiretirement. Early in the marriage, respondent developed a sole proprietorship called Hollywood Tool & Gauge Company. In 1954 and 1956, respondent formed Hudson Tool & Die Corporation and Hollywood Perforator, Inc., respectively, and the sole proprietorship ended. Respondent was president of Hollywood until about eight years ago and presently acts as a consultant. He has always been Hudson's president and continues to be so employed at a salary of $300 per week. Beginning in 1983, he will receive a monthly pension of $99.40 from Hudson. Petitioner played no active role in either company. Although the parties entered the marriage with limited assets, they steadily prospered and in later years enjoyed an affluent lifestyle. In the last few years, they spent $200,000 annually on living expenses, travel, gifts and items of personalty.

The trial court classified the principal marital assets as follows: a marital residence in Lincolnwood, owned in joint tenancy, having a fair market value of $255,000 and a mortgage of $12,000; household furniture, furnishings and fixtures, 6,750 shares of Hollywood, all but 100 of which were held in respondent's name; 129½ shares of Hudson, held in respondent's name; respondent's undivided one-half interest in property located in Rosemont, from which monthly rental income of $800 is derived; petitioner's vacant lot in Hawaii purchased for $3,000; and various stocks, jewelry, furs and other items of personalty in their respectives names or possession.

The final judgment found that petitioner was entitled to one-half of the marital assets as her just proportion and that respondent had dissipated marital assets worth $415,545. The marital property was allocated as follows: Petitioner was awarded 3,375 shares of Hollywood; 64 3/4 shares of Hudson; sole and exclusive possession of the marital residence, free and clear of all encumbrances, until she attained age 65, remarried, or either party died, at which time the home would be sold and the net proceeds divided equally between the parties; the household furniture, furnishings and fixtures; one-half of respondent's property in Rosemont; an automobile leased by Hollywood; the cash amount of $50,000; and the balance of the assets in her name or possession. Respondent was awarded the remaining 3,375 shares of Hollywood and 64 3/4 shares of Hudson; the remainder of his interest in the Rosemont property; and the balance of the assets held in his name or possession. The court did not ascribe a specific value to any item of marital property. Each party was held responsible for his or her own attorney's fees. Concluding that petitioner was not then qualified to support herself and was entitled to reasonable maintenance, the court also awarded petitioner rehabilitative maintenance for five years in a sum equal to 40% of respondent's net monthly income.

Two days later, the trial court *sua sponte* suspended the effect of, and

scheduled a hearing to clarify, the provision awarding the marital residence to petitioner. At this hearing, the court *sua sponte* modified the provision. As modified, petitioner was required to pay the balance of the mortgage, utilities, ordinary maintenance, taxes, insurance and other obligations incident to possession of the marital residence. At the same hearing, the court also *sua sponte* modified the provision awarding 50 percent of the shares of Hollywood and Hudson. Under the modification, these shares were to be held as security for respondent's payment to petitioner of 40 percent of the value of respondent's ownership interest in Hollywood and Hudson; the value of respondent's ownership interest was not set forth. Although this disposition represented a departure from the 50 percent division of stock contained in the court's original pronouncement, memorandum of judgment and final judgment order, the court announced that giving the shares to petitioner only as security was always its intention. The parties then filed their respective notices of appeal.

Thereafter, respondent filed a petition to set an appeal bond and stay the enforcement of the judgment, and petitioner sought a change of venue. The trial judge recused himself and the cause was transferred to Judge Charles J. Fleck. Petitioner then requested and, after an evidentiary hearing, was granted $6,800 in attorney's fees for defense of respondent's cross-appeal. Respondent's appeal from the allowance of such fees followed.

■■ We initially consider the issues concerning the disposition of the parties' marital property under the guidance of the relevant factors set out in section 503(c) of the Illinois Marriage and Dissolution of Marriage Act. (Ill. Rev. Stat. 1979, ch. 40, par. 503(c).) The distribution of marital property rests within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion. *In re Marriage of Smith* (1980), 90 Ill. App. 3d 168, 412 N.E.2d 985.

■■ Petitioner first contends that the trial court abused its discretion in modifying the final judgment so as to award her 50 percent of the shares of Hollywood and Hudson only as security for respondent's payment of 40 percent of the value of his ownership interest in those corporations. She argues further that the equal, in-kind division of the corporate stock originally ordered is the only distribution which is in just proportions. Clearly, a trial court has jurisdiction for 30 days after entry of a final judgment to modify the judgment *sua sponte* in order to do justice between the parties. (*Welch v. Ro-Mark, Inc.* (1979), 79 Ill. App. 3d 652, 398 N.E.2d 901.) Our examination of the record convinces us, however, that the modification in the present case was erroneous.

■■ As even respondent acknowledges, the court erred in failing to determine the value of respondent's ownership interest in the two

corporations. Except where the parties are awarded percentage interests in a particular item, valuation of marital property is necessary to reach a just apportionment. (*In re Marriage of Boone* (1980), 86 Ill. App. 3d 250, 408 N.E.2d 96; *In re Marriage of Donley* (1980), 83 Ill. App. 3d 367, 403 N.E.2d 1337.) In the absence of evidence of such valuation, there is no basis upon which the reviewing court can determine the propriety of the directed property distribution. See *In re Marriage of Olsher* (1979), 78 Ill. App. 3d 627, 397 N.E.2d 488; see also *In re Marriage of Leon* (1980), 80 Ill. App. 3d 383, 399 N.E.2d 1006.

Here, two experts offered disparate estimates of the value of respondent's shares of Hudson. One witness estimated the value of the stock at $800,000 while the other gave the value of $550,000. The court did not fix the value of respondent's Hudson stock. Moreover, absolutely no evidence was adduced as to the value of the Hollywood stock. Consequently, there is no basis upon which to ascertain the amount owed to petitioner or to determine whether the property distribution was in just proportions.

■■■ Furthermore, awarding the stock merely as security for payment, where no amount, manner or time for payment is set forth is tantamount to an illusory division. (See *In re Marriage of Gehret* (1978), 41 Colo. App. 162, 580 P.2d 1275.) The efficacy of a property distribution results from placing in the hands of each party a definable or ascertainable portion of some attributes of ownership. (*In re Marriage of Gehret*.) In distributing property, courts should seek a high degree of finality so that parties can plan their future with certainty and are not encouraged to return repeatedly to the courts. (*In re Marriage of Lee* (1979), 78 Ill. App. 3d 1123, 398 N.E.2d 126.) Under the present order, respondent retained all the incidents of ownership while petitioner was left with only the vague expectation that at some time, in some manner, she would receive some unascertained amounts of money.

■■ While we thus agree with petitioner's contention that the modified disposition of the stock is erroneous and must be reversed, we are not in accord with her further position that an equal division of the stock itself is the only equitable distribution. Where property is not susceptible to division in kind or such division is inequitable, the court may, in its discretion, award the property to one spouse subject to an obligation to pay the nonacquiring spouse for the interest lost. Such repayment may be arranged by offsetting other marital property or by cash payments, either in a gross amount or installments. (*In re Marriage of Lee*.) Division of a business or close corporation would appear particularly disadvantageous where it would necessitate ongoing business association between the parties and where, as here, the evidence reflects animosity between the

parties or an inability of the parties to cooperate on major business or financial matters. See generally *In re Marriage of McMahon* (1980), 82 Ill. App. 3d 1126, 403 N.E.2d 730.

Arguing that the corporations accounted in large measure for the parties' lavish lifestyle, petitioner urges that awarding her a cash amount instead of the stock itself would thwart the Act's purpose of providing for post-marital support through property distribution rather than maintenance. (See *Kujawinski v. Kujawinski* (1978), 71 Ill. 2d 563, 376 N.E.2d 1382.) The record reveals that although the corporations did not cover the parties' basic living expenses, certain benefits did accompany ownership: Hollywood owns a condominium in Hawaii which the parties rented at a price of $2,400 per year; Hollywood leased automobiles for the parties' use; the companies paid membership costs in several country clubs. While such benefits may be considered in compensating the nonacquiring spouse for his or her interest lost, we do not believe they, in themselves, compel an in-kind distribution.

From our review of the record, we cannot say that awarding the corporate stock to respondent subject to an obligation to pay petitioner an appropriate sum would constitute an inequitable division. Unlike petitioner, respondent is directly involved in these closely held corporations. This method of dividing the marital property would serve to disengage the parties' financial affairs as well as reduce the likelihood of interference with one another or with the operations of the companies. We note further that after considering the evidence, the court found that petitioner was entitled to one-half of the marital property. The relevant factors amply support an equal apportionment of marital property. Without evidence of the value of the corporate stock, however, we are unable to determine whether a cash award of 40 percent of the value of respondent's corporate ownership, together with the other property allocated to petitioner, is sufficient to accomplish the directed equal distribution of marital property.

■■ Accordingly, the case must be remanded for a determination, at a minimum, of the value of respondent's ownership interest in Hollywood and Hudson and the exact sum to be paid to petitioner. The court must also devise a feasible method of effecting payment to petitioner within a reasonable length of time. Upon remand, the court may, if necessary in light of additional evidence elicited, increase the 40 percent or redistribute other marital property so as to achieve an equal distribution between the parties. Since the division of marital property is among those factors to be considered in deciding whether to award maintenance, once it is found that a marital asset has been improperly valued, courts have deemed it desirable to remand to the trial court all interrelated issues of property and maintenance for a determination whether additional changes are

warranted. (*In re Marriage of Peshek* (1980), 89 Ill. App. 3d 959, 412 N.E.2d 698.) We too deem it advisable to remand the cause for a reconsideration of issues of property and maintenance. We will, however, address those issues which may reemerge during such further proceedings. Where the issues cannot be resolved now, we will attempt to set some guidelines to assist the trial court in its determinations.

■■ Petitioner charges that in awarding her exclusive possession of the marital home, the court abused its discretion in requiring her to pay those expenses relating to maintaining the home's value, such as mortgage, taxes and insurance, while permitting respondent to share equally in the net proceeds upon sale. Since petitioner was awarded sole possession as well as the household furniture and furnishings, it is not inequitable to require her to pay such expenses. Respondent, who must bear the cost of establishing a new residence, remains liable for one-half of extraordinary maintenance expenses. An equal property division should suffice to enable petitioner to pay these monthly expenses of approximately $700. Moreover, nothing prevents petitioner from selling the home immediately and realizing her share of the net proceeds.

Respondent contests the award to petitioner of one-half of his undivided one-half interest in the Rosemont property. He argues that such retention of common ownership of marital property constitutes an unjust division.

Hudson is the lessee of the subject property. Prior to dissolution, the sole owners of the property were respondent and James J. Coduti, who were also the principal shareholders of Hudson. Respondent suggests that allowing petitioner to have an interest in that property would perpetuate the parties' conflicts and create a potential for interference with respondent and Hudson. The Act encourages property distributions which disentangle the parties' financial affairs and eliminate potential interference with one another. Yet the record before us is devoid of evidence suggesting that petitioner's ownership would require frequent or continuing business contact with respondent, or that her interest and role as a lessor might impede Hudson's operations. We thus cannot say the court abused its discretion in dividing the property between the parties. On remand, however, the court may wish to hear additional testimony concerning potential or actual difficulties arising from this common ownership.

Respondent suggests further that since the court intended to divide the equity in the marital home equally between the parties, the logical way to achieve this result while avoiding common ownership is to award the home to petitioner and the Rosemont property to respondent, and offset the difference in equities by reducing respondent's obligations to petitioner by $9,000. Even assuming the equities are comparable, such

suggested division does not take into account that the Rosemont property, unlike the marital residence, produces significant rental income. Awarding one of these parcels to petitioner and the other to respondent, to be equitable, might thus require a major redistribution of the parties' cash or property.

Both parties challenge the $50,000 cash awarded to petitioner. Petitioner charges that the amount is inadequate in light of the court's finding that respondent dissipated marital assets worth $415,545. Respondent urges that the court's finding of dissipation is contrary to law and to the manifest weight of the evidence.

■■■ Dissipation of marital assets by one spouse in contemplation of dissolution of marriage is not an acceptable practice. (*In re Estate of Chandler* (1980), 90 Ill. App. 3d 674, 413 N.E.2d 486.) Under section 503(c)(1) of the Marriage Act, the court may consider such conduct and compensate the disadvantaged spouse when apportioning the marital property. (Ill. Rev. Stat. 1979, ch. 40, par. 503(c)(1).) Dissipation may be found where the spouse uses marital property for his own benefit and for a purpose unrelated to the marriage at a time at which the marriage is undergoing an irreconcilable breakdown. (*Klingberg v. Klingberg* (1979), 68 Ill. App. 3d 513, 386 N.E.2d 517.) To show dissipation, it is not necessary that the marital property be sold or transferred at the time of separation or after dissolution proceedings are instituted. Such requirement is overly restrictive.

Petitioner testified that in 1973 or 1975 she consulted her attorney concerning her marital problems and that she informed respondent of her action. In 1977 she filed her petition for dissolution. Respondent testified to transfers of certain funds and real estate between 1975 and 1977. After considering the evidence, the trial court found that respondent, after becoming aware of the marital problems, embarked upon a course of action designed to conceal, manipulate or dissipate marital assets pursuant to which certain funds and real estate were transferred. Respondent argues that the challenged transactions involved either nonmarital property or the use of marital property for marital purposes. Because of our remand, we shall discuss the various transactions.

Respondent maintains that the bank funds purportedly dissipated constituted nonmarital property belonging to his son, Kurt Hellwig, or to Hollywood. Two of the bank accounts were joint tenancy accounts in the names of respondent and Kurt; the third was a corporate account for Hollywood. On October 28, 1977, the day after the petition for dissolution was filed, these accounts were closed by withdrawals made by respondent. The amounts withdrawn were then paid to Kurt by checks totaling $40,005.39. Respondent testified that the funds belonged to Kurt, who had a substantial estate of his own; that Kurt had an absolute right to withdraw

the funds; and that when the petition for dissolution was filed, he suggested that Kurt withdraw the funds so as to have them available later without any problems. As to the corporate account, respondent testified that the funds were paid to Kurt in his capacity as Hollywood's president, but offered no explanation or corporate purpose for the transaction.

■■ The accounts bearing respondent's name, having been acquired after the marriage, are presumed to be marital property. (Ill. Rev. Stat. 1979, ch. 40, par. 503(b).) The presumption, of course, may be overcome. Resolution of this issue is a matter peculiarly within the province of the trial court, and it was entitled to disbelieve or reject respondent's explanation of these transfers. Based upon the evidence of the timing and circumstances of respondent's withdrawals, the court could have properly concluded that these funds were marital property transferred by respondent for no apparent marital purpose.

■■ Respondent also claims that a certain parcel of Chicago realty was transferred to Kurt on January 17, 1977, for marital purposes. This property was valued at $65,000, and had an outstanding $15,000 mortgage. Respondent first testified that he assigned his beneficial interest in the property to Kurt as a gift, and then testified that the property was transferred as repayment of loans advanced by Kurt in the sum of $45,000. Respondent maintained that these loans were used for marital purposes, namely, meeting respondent's margin calls for stocks used to sustain the parties' lifestyle. Interest bearing notes evidencing loans of $26,000 and $40,000 in 1974 and 1975, respectively, and checks issued to Kurt by respondent for the repayment of interest on these loans were introduced. Kurt's Federal income tax returns for 1976, 1977, and 1978 reflected adjusted gross incomes of $29,447, $39,200, and $39,672, respectively. They also showed interest income, while respondent's returns showed a corresponding interest deduction. Petitioner testified that Kurt had no money to lend to respondent since, in 1973, Kurt was earning only $150 per week. After hearing the conflicting testimony, it was the prerogative of the court to determine the issue. Based upon the contradictions in respondent's testimony as to whether the transfer was a gift or for value and the transfer's proximity in time to the dissolution proceedings, we cannot say that the court erred in finding that respondent dissipated this marital asset.

■■ Another challenged transaction involved the transfer of a parcel of realty located on Pacific Avenue seven months before dissolution proceedings commenced. This property had a fair market value of $90,000. Respondent asserts that the property was sold in the course of his normal business activities and that the proceeds were used for family expenses, not his sole benefit. Petitioner acknowledged that throughout the marriage respondent bought and sold real estate as part of his business

activities. In view of respondent's uncontroverted testimony and the lack of evidence suggesting the proceeds were used for respondent's benefit alone, we believe the finding that the transfer of this property was a dissipation was contrary to the manifest weight of the evidence. Similarly, the record does not support the trial court's finding that a transfer of a three-acre vacant lot in Elk Grove Village constituted a dissipation. In response to petitioner's claim that respondent had an interest in this property which was transferred to Hollywood, respondent maintains that the property was nonmarital and always owned by Hollywood and Coduti. The testimony of respondent and Coduti was conflicting as to whether the purchase price was paid by Hollywood and Coduti, or respondent and Coduti. Nevertheless, the record reflects that respondent and Coduti executed a trust agreement in May 1973, and that in October 1973, respondent assigned his beneficial interest in this property to Hollywood. Even if respondent were deemed to have had an interest, such interest was merely transferred to Hollywood, another marital asset.

■■ Finally, the court found that, in 1978, after dissolution proceedings had begun, respondent closed a brokerage account worth $180,000. Respondent's uncontroverted testimony was that the stock was sold to finance the parties' lifestyle. Petitioner's accountant testified that the $180,000 was disbursed to respondent over a period of time spanning January 1975 to November 1977. The evidence was insufficient to support a finding of dissipation.

■■ The trial court properly ruled that respondent had dissipated certain marital assets. Because of our further holding that the evidence did not support a dissipation finding as to other items, we believe the cash sum award of $50,000 was adequate and equitable. We also note that the Act does not mandate an award of cash or property equal to half of the amount dissipated.

We next address the parties' respective objections to the maintenance award. Petitioner urges that the trial court erred in awarding her rehabilitative maintenance for a period of five years instead of permanent maintenance. Respondent objects to the amount of the award.

■■■ Once the trial court determines that maintenance is appropriate, a finding which is not challenged here, the amount and duration of the award shall be as the court deems just after considering the relevant factors mentioned in the Act. (Ill. Rev. Stat. 1979, ch. 40, par. 504(b)(1) through (6).) Rehabilitative or time limited maintenance is new to Illinois law. Underlying the concept of time limited maintenance is the sound policy that such awards may provide an incentive for the spouse receiving support to use diligence in procuring training or skills necessary to attain self-sufficiency. (*Lindsay v. Lindsay* (1977), 115 Ariz. 322, 565 P.2d 199.) This policy, however, must be balanced against a realistic appraisal of the

likelihood that the spouse will be able to support herself in some reasonable approximation of the standard of living established during the marriage, especially where the marriage is of long duration and the spouse has had a long term absence from the labor market. (*Lindsay v. Lindsay.*) Although each case must be decided on its own facts, some general guidelines for determining whether to grant time limited or permanent maintenance have been approved by this court. (*In re Marriage of Pieper* (1979), 79 Ill. App. 3d 835, 398 N.E.2d 868.) Maintenance for a limited period is appropriate where the spouse is employable at an income not overly disproportionate from the standard of living established during the marriage. Conversely, where the spouse is not employable or is employable only at a low income as compared to her previous standard of living, then permanent maintenance would be appropriate.

■■ ■ In the present situation, petitioner's lengthy marriage, long absence from the labor market, lack of special vocational skills or training, age, and poor health would appear to militate against time limited maintenance. These combined factors render petitioner's ability to support herself within five years on a level approximating the parties' luxurious living standard uncertain. In limiting the duration of the maintenance award, the court apparently assumed that petitioner could attain self-sufficiency within five years. An award of maintenance for a limited time should be based upon circumstances disclosed by the evidence, not pure speculation. (*In re Marriage of Pieper.*) In view of the lack of evidence supporting the five-year limit set by the court, the duration of the award should be reexamined on remand. We cannot say, however, that the facts before us necessarily dictate an award of permanent maintenance.

Relying on *In re Marriage of Parello* (1980), 87 Ill. App. 3d 926, 409 N.E.2d 461, respondent argues that the court erred in basing the maintenance award upon his income, perquisites and retained assets, and that the award should be limited to a percentage of net income from employment only. *Parello* is distinguishable. There, this court held improper an award based upon a percentage of the spouse's income from employment as well as his income from any other source. We observed that the language "other source" appeared to have been inserted to insure that the party seeking support would share any income her spouse received from other jobs undertaken after dissolution. To permit such award contravened the Act's requirement that the amount of maintenance be based upon the standard of living established during the marriage. Here, in contrast, the parties made use of respondent's employment income, perquisites, and retained assets in establishing their high standard of living during the marriage.

Respondent also urges that the 40 percent award is excessive and that

he is being penalized for the extravagant lifestyle petitioner established prior to dissolution. Respondent testified that in 1974, he informed petitioner that their expenses exceeded his income and that they were depleting assets to maintain their high standard of living; petitioner denied being so advised. Apparently the court disbelieved respondent's claim that the parties were living well beyond their means. While the 40 percent award does not appear excessive in view of the parties' lifestyle and petitioner's limited prospects for employment which would provide a comparable income, redistribution of the property on remand may require an adjustment in the amount of maintenance.

██ We reject petitioner's next contention that the trial court abused its discretion in requiring her to pay her own attorney's fees without conducting a hearing to determine the relative financial abilities of the parties and the value of the services rendered. Where the court had evidence before it of the financial resources of both parties when ruling on the issue of attorney's fees and no hearing had been requested, the trial court's failure to conduct a hearing on the propriety of the award of attorney's fees was not error. (See *Scott v. Scott* (1979), 72 Ill. App. 3d 117, 389 N.E.2d 1271.) The equal apportionment of the property between the parties has provided petitioner with sufficient funds to pay her attorney's fees.

We next consider respondent's argument that the trial court erred in awarding petitioner prospective attorney's fees for defense of the cross-appeal.

██ We initially reject respondent's contention that the Act does not authorize such award. Recently, in *In re Marriage of Giammerino* (1981), 94 Ill. App. 3d 1058, 419 N.E.2d 598, we construed section 508 of the Act (Ill. Rev. Stat. 1979, ch. 40, par. 508), and held that the trial court has jurisdiction to award attorney's fees for the defense of pending appeals. Contra, *In re Marriage of Wright* (1980), 92 Ill. App. 3d 708, 415 N.E.2d 1196.

We also disagree with respondent's assertion that petitioner failed to establish that the requested fees were necessarily incurred. The essence of respondent's argument is that the cross-appeal focuses on the same substantive issues as the appeal. Even though, at times, the parties' issues involved common statutory provisions, the court properly concluded that substantively different issues were raised on appeal and cross-appeal. In particular, the finding of dissipation and appointment of a sequestrator were challenged only on cross-appeal.                                          —

██ Finally, respondent asserts that the award was against the manifest weight of the evidence because the evidentiary hearing failed to demonstrate that respondent had a greater ability than petitioner to pay the fees. Petitioner testified that she owned stock worth $1,500; had funds in bank accounts totaling $220; had no regular income from employment; was

receiving $900 per month from respondent; and had to borrow money for her living expenses. An accountant testified that during 1979, respondent's gross earnings from Hudson totaled $18,000, and that he had $24,041 available in cash prior to paying maintenance and had $13,241 available after paying maintenance. Considering the relative financial resources of the parties, the court did not abuse its discretion in ruling that respondent should pay petitioner attorney's fees for defense of the cross-appeal.

Remaining for our consideration is respondent's contention that the order appointing the sequestrator is contrary to law and against the manifest weight of the evidence.

■■ Sequestration is an equitable remedy authorized by statute:

"When a defendant is defaulted, or upon hearing, the court may enter such order as may be just, and may enforce such order, either by sequestration of real and personal estate, * * * or by ordering the demand of the plaintiff to be paid out of the effects or estate sequestered, or which are included in such order; and by the exercise of such other powers as may be necessary for the attainment of justice." (Ill. Rev. Stat. 1979, ch. 110, par. 392.)

In Illinois, an order of sequestration is a proper equitable remedy for enforcement of a judgment or order, including a judgment of dissolution of marriage. *In re Marriage of Rochford* (1980), 91 Ill. App. 3d 769, 414 N.E.2d 1096; *Victor v. Victor* (1961), 31 Ill. App. 2d 60, 175 N.E.2d 655.

A brief recitation of the circumstances surrounding the order of sequestration is necessary at this point. On October 27, 1977, the day the petition for dissolution was filed, the trial court *ex parte* entered a temporary restraining order preventing respondent from selling, hypothecating, mortgaging, transferring, or encumbering marital assets. Later by agreement, the order was modified to create a mutual preliminary injunction and to permit marital property to be transferred or disposed of in the usual course of business or for necessities. On December 15, 1977, in response to a petition, respondent was ordered to pay petitioner $2,000 within 10 days. An agreed order directed respondent to pay petitioner $200 per week as temporary maintenance, to pay $200 per month for charges made on various accounts, and to submit petitioner's medical bills to respondent's insurance carrier for reimbursement.

On July 27, 1979, after completion of testimony, petitioner filed an emergency petition for appointment of a sequestrator alleging that since 1973, respondent commenced and had continued a course of action to dissipate marital assets. Respondent's answer denied the material allegations of the petition. On August 10, 1979, the court appointed a sequestrator. In its order, the court found that respondent concealed, manipulated or dissipated marital assets prior to and during the course of these proceedings; that he failed to comply with orders of the court; that

appointment of a sequestrator was necessary to protect the parties' assets, to effect an orderly and proper transfer of marital property to petitioner, and to ensure the payment of any maintenance ordered. That same day, the court orally restated its finding of dissipation and the need to remove marital assets from respondent pending distribution, and found further that respondent was in arrears on the temporary order of support, payments of charges, and medical bills. The court subsequently denied respondent's motion to vacate the sequestration appointment order.

■■ Respondent first maintains that the appointment of a sequestrator was erroneous because he had complied with all valid court orders and had not dissipated marital assets. We have already concluded that the evidence supported a finding of dissipation. In view of that dissipation, the court could properly have deemed sequestration a necessary and just measure to secure performance of its maintenance and other orders by preserving the remaining assets in respondent's possession. (See *Manning v. Mercantile Securities Co.* (1909), 242 Ill. 584, 90 N.E. 238, *aff'd sub nom. Rhodus v. Manning* (1910), 217 U.S. 597, 54 L. Ed. 896, 30 S. Ct. 696.) The court also had petitioner's testimony at trial that respondent was 11 weeks in arrears on the temporary maintenance order although she did not recall which weeks.

Respondent's contention that the order appointing a sequestrator is void because it is indefinite and attempts to order compliance by parties not subject to the court's jurisdiction is without merit. The order directs the sequestrator to collect assets, funds and property belonging to or held in trust for respondent. This language is not fatally indefinite; it sufficiently directs the sequestrator to collect and set apart respondent's entire personal estate. (See *Victor v. Victor* (1961), 31 Ill. App. 2d 60, 175 N.E.2d 655.) Nor does the sequestration order leave respondent "penniless" as he claims, but rather operates to place possession of the property in the court in order to enforce obedience to its order. (*Victor v. Victor.*) Respondent's charge that the order reaches property held by persons not subject to the court's jurisdiction is also unavailing inasmuch as sequestration runs against the property of a contumacious defendant and is a proceeding in rem. *Manning v. Mercantile Securities Co.*; *Ryan v. Ryan* (1978), 56 Ill. App. 3d 483, 371 N.E.2d 1199.

■■ Finally we disagree with respondent's contention that the sequestration order ceased to have any force and effect because the judgment of dissolution subsequently entered did not contain an appointment of a sequestrator. The judgment of dissolution did not terminate the sequestration since the articulated purpose of the remedy was to assure the payment of sums, or the transfer of property, directed by judgment during the pendency of the action or at its termination. Moreover, on the same day as entry of the judgment of dissolution, the trial court

explicitly declined, by separate order, to vacate the sequestrator's appointment.

For the foregoing reasons, the orders of the circuit court of Cook County are affirmed in part, reversed in part, and remanded for further proceedings consistent with the views expressed in this opinion.

Affirmed in part; reversed and remanded in part.

RIZZI, P. J., and McGILLICUDDY, J., concur.